**Hearing Date and Time:  November 18, 2020 at 11:00 a.m.**
**Objection(s) Due:  November 11, 2020**

Nicole L. Greenblatt, P.C.
Anthony R. Grossi
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Craig S. Primis, P.C.
Ronald K. Anguas, Jr. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:      (202) 389-5000
Facsimile:      (202) 389-5200

Mark McKane, P.C. (admitted *pro hac vice*)
Michael P. Esser (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
555 California St.
San Francisco, California 94104
Telephone:      (415) 439-1400
Facsimile:      (415) 439-1500

*Counsel to Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GARRETT MOTION INC., *et al.*,[1] | ) | Case No. 20-12212 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| GARRETT MOTION INC. and GARRETT ASASCO INC., | ) | |
| | ) | |
| | ) | Adv. Proc. No. 20-01223 (MEW) |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| HONEYWELL INTERNATIONAL INC., HONEYWELL ASASCO LLC, HONEYWELL ASASCO 2 LLC, HONEYWELL HOLDINGS INTERNATIONAL INC., SU PING LU, AND DARIUS ADAMCZYK | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS ADVERSARY PROCEEDING**

---

[1] The last four digits of Garrett Motion Inc.'s tax identification number are 3189. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/garrettmotion. The Debtors' corporate headquarters is located at La Pièce 16, Rolle, Switzerland.

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

BACKGROUND .................................................................................................. 4

LEGAL STANDARD ........................................................................................... 8

ARGUMENT ....................................................................................................... 9

I.      Garrett's Facial Attacks On The Indemnification And Reimbursement
Agreement Fail As A Matter of Law. ...................................................... 9

        A.    Plaintiffs' Fiduciary Duty Claims Fail Under Settled Delaware Precedent. .......... 9

        B.    Garrett's Unconscionability Claims Do Not Provide A Separate Avenue
For Relief. .............................................................................................. 14

        C.    The Agreement Was Supported By Valid Consideration And Does Not
Represent "Corporate Waste." ................................................................ 16

II.     Honeywell Is Entitled To Full Payment Under The Indemnification And
Reimbursement Agreement. .................................................................... 18

        A.    The Indemnification And Reimbursement Agreement Accords With New
York Law On Indemnification For Punitive Damages and Intentional
Misconduct............................................................................................. 18

            1.    New York Law Does Not Bar Indemnification Or Reimbursement
For Punitive Damages Based On Prior Misconduct. ............................... 19

            2.    Any Limit On Indemnification Or Reimbursement Of Punitive
Damages Does Not Apply To Settlements. ............................................. 21

        B.    Garrett Cannot Attack The "Reasonableness" Of Honeywell's Settlements........ 23

III.    Garrett's Information-Sharing Claim Fails. ................................................. 25

CONCLUSION ..................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amcan Holdings, Inc. v. Can. Imperial Bank of Commerce*,
   70 A.D.3d 423 (N.Y. App. Div. 2010) ...................................................................26

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*,
   1987 WL 16508 (Del. Ch. Sept. 8, 1987) ...............................................................12

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*,
   545 A.2d 1171 (Del. 1988) ..........................................................1, 3, 9, 10, 12, 15

*Asbestos Workers Phila. Pension Fund v. Bell*,
   137 A.D.3d 680 (N.Y. App. Div. 2016) ...................................................................9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................................9

*Aviall, Inc. v. Ryder Sys.*,
   110 F.3d 892 (2d Cir. 1997)...................................................................1, 3, 9, 10

*Aviall, Inc. v. Ryder Sys.*,
   913 F. Supp. 826 (S.D.N.Y. 1996)...........................................................12, 13, 14

*Brauer v. Cent. Tr. Co.*,
   77 A.D.2d 239 (N.Y. App. Div. 1980) .............................................................3, 20

*Brehm v. Eisner*,
   746 A.2d 244 (Del. 2000) .......................................................................................17

*Campisi v. Gambar Food Corp.*,
   130 A.D.3d 854 (N.Y. App. Div. 2015) .................................................................23

*Chemours Co. v. DowDupont Inc.*,
   2020 WL 1527783 (Del. Ch. Mar. 30, 2020)....................................3, 10, 12, 14, 15

*In re Chowaiki & Co. Fine Art Ltd.*,
   593 B.R. 699 (Bankr. S.D.N.Y. 2018)...................................................................8

*Feuer v. Menkes Feuer, Inc.*,
   8 A.D.2d 294 (N.Y. App. Div. 1959) ................................................18, 19, 20, 24

*Fleisher v. Phoenix Life Ins. Co.*,
   858 F. Supp. 2d 290 (S.D.N.Y. 2012).....................................................................26

*Gibbs-Alfano v. Burton*,
    281 F.3d 12 (2d Cir. 2002)............................................................3, 22, 23

*Hartford Acc. & Indemn. Co. v. Village of Hempstead*,
    397 N.E.2d 737 (N.Y. 1979)..............................................................19

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995)...............................................................16

*Int'l Fid. Ins. Co. v. Spadafina*,
    192 A.D.2d 637 (N.Y. App. Div. 1993) ................................................25

*In re Iridium Operating LLC*,
    373 B.R. 283 (Bankr. S.D.N.Y. 2007)..................................................11

*Katun Corp. v. Clarke*,
    484 F.3d 972 (8th Cir. 2007) ............................................................19

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991)................................................................6

*Loscher v. Hudson*,
    182 P.3d 25 (Kan. Ct. App. 2008) ......................................................19

*Mandala v. NTT Data, Inc.*,
    --- F.3d ---, 2020 WL 5614818 (2d Cir. Sept. 21, 2020) ...........................9

*McMillan v. Intercargo Corp.*,
    768 A.2d 492 (Del. Ch. 2000)...........................................................13

*In re Old CarCo LLC*,
    435 B.R. 169 (Bankr. S.D.N.Y. 2010) .............................................16, 17

*Oxy USA, Inc. v. S.W. Energy Prod. Co.*,
    161 S.W.3d 277 (Tex. App. 2005)......................................................19

*Parker Hannifin Corp. v. Standard Motor Prods., Inc.*,
    2019 WL 5425242 (N.D. Ohio Oct. 23, 2019) ..................................20, 21

*Republic Ins. Co. v. Real Dev. Co.*,
    161 A.D.2d 189 (N.Y. App. Div. 1990) ...............................................24

*In re Residential Capital, LLC*,
    524 B.R. 563 (Bankr. S.D.N.Y. 2015)..................................................22

*In re Santa Fe Pac. Corp. S'holder Litig.*,
    669 A.2d 59 (Del. 1995) .................................................................14

*Star Ins. Co. v. A&J Constr. of N.Y., Inc.*,
　2017 WL 6568061 (S.D.N.Y. Dec. 22, 2017) ................................................................24, 25

*Tokio Marine v. Macready*,
　803 F. Supp. 2d 193 (E.D.N.Y. 2011) .........................................................................4, 25

*Trenwick Am. Litig. Tr. v. Ernst & Young, LLP*,
　906 A.2d 168 (Del. Ch. 2006)....................................................................9, 10, 12, 13

*In re Tronox Corp.*,
　503 B.R. 239 (Bankr. S.D.N.Y. 2013) ...............................................................10, 11

*Turner v. Bernstein*,
　1999 WL 66532 (Del. Ch. Feb. 9, 1999) ................................................................17

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*,
　2013 WL 12124306 (N.D. Tex. June 18, 2013) ........................................10, 11, 12

*VantagePoint Venture Partners 1996 v. Examen, Inc.*,
　871 A.2d 1108 (Del. 2005) ...................................................................................9

*VFB LLC v. Campbell Soup Co.*,
　482 F.3d 624 (3d Cir. 2007)............................................................................13, 18

*Woods v. Boston Scientific Corp.*,
　2007 WL 754093 (S.D.N.Y. Feb. 9, 2007)............................................................15

**Statutes**

N.Y. Gen. Oblig. Law § 5-1105............................................................................17

**Rules**

Fed. R. Bankr. P. 7012(b) ..................................................................................8

Fed. R. Civ. P. 12(b)(6)......................................................................................8

**Other Authorities**

*Williston on Contracts* (4th ed. 1990)............................................................19

## **INTRODUCTION**

In this case, Garrett seeks to repudiate the liabilities it assumed as part of its spin-off from Honeywell, but its efforts to do so fail as a matter of law.  Indeed, the same claims Garrett advances to invalidate the spin-off have repeatedly been rejected by courts in Delaware and New York.  Garrett's goal is to take the billions of dollars in profit-generating assets that Honeywell conveyed to it while at the same time pursuing an irrational mission to void the rest of the transaction.  According to Garrett, it's just not fair to assign liabilities to a spun-off company, especially when the parent controlled the deal and dictated the terms to its subsidiary.  But that is a losing argument.

Garrett's entire case is premised on a plain misunderstanding of settled corporate law governing spin-offs.  The Delaware Supreme Court, whose decisions govern Garrett's internal affairs as a Delaware corporation, has held unequivocally that "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."  *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988)   And the Second Circuit has been equally clear: even where a SpinCo "play[s] no role in the drafting of the Distribution Agreement and ha[s] no power to bargain over its terms . . . that in no way points to any infirmity in the contracting process"—rather, the parent is "obligated to draft those terms in the manner most advantageous to its shareholders, who would also be the shareholders of [the SpinCo] immediately following the spin-off."  *Aviall, Inc. v. Ryder Sys.*, 110 F.3d 892, 896 (2d Cir. 1997).   For all of Garrett's rhetoric and complaining, there is no legal basis for it to avoid its obligations to Honeywell, and its efforts to do so fail as a matter of law.

This motion should come as no surprise to Garrett.  Garrett filed this same defective complaint in New York state court on January 15, 2020.  Honeywell promptly moved to dismiss

1

on March 5, 2020.  Month after month passed with no response from Garrett.  Instead, Garrett

promised that it would file an amended complaint by September 15, 2020.  That never materialized

either.  Instead, Garrett removed this case to federal court, and it was automatically referred to the

Bankruptcy Court.  Again, though it has had more than seven months to evaluate Honeywell's

motion to dismiss and evaluate amendments or additional claims, Garrett once again failed to file

an amended complaint.  Instead, while Garrett recently informed Honeywell that it may file an

amended complaint in the future, at this time Garrett intends to proceed with the complaint

removed from state court as the operative complaint.  Accordingly, Honeywell brings this motion

to dismiss Garrett's claims, which are just as legally defective now as they were when Garrett first

filed them nine months ago in state court.

The grounds for dismissal are straightforward and based on settled law.  Cutting through

all the bluster and repetitive counts of Garrett's Complaint, Garrett's claims fall generally into

three categories:

***First***, Garrett asserts the Indemnification and Reimbursement Agreement (the

"Agreement") is void in its entirety, either because it is the product of a breach of fiduciary duty,

is unconscionable, lacks consideration, or represents "corporate waste."  At bottom, these claims

all rest on the assertion that there was something improper or "unfair" about the Garrett spin-off

because, as part of the transaction, Garrett was required to assume certain payment obligations tied

to Honeywell's Bendix asbestos liabilities.  But the allegations in the Complaint fail under settled

principles of corporate law, which permit a parent like Honeywell to set the terms of a spin-off

however it sees fit and solely in the interest of the parent's shareholders, not the subsidiary's.  *See,*

*e.g.*, *Aviall*, 110 F.3d at 896; *Anadarko*, 545 A.2d at 1174; *Chemours Co. v. DowDupont Inc.*, 2020

WL 1527783, at *14 (Del. Ch. Mar. 30, 2020). Garrett's attempts to invalidate the Agreement either ignore this body of law or try to make an impermissible end-run around it.

*Second*, Garrett asserts that it is entitled to a reduction in its payment obligations on the theory that the Agreement impermissibly requires it to reimburse Honeywell for (i) punitive damages paid to Bendix asbestos claimants and (ii) unreasonably large payments made to claimants without prior notice to Garrett.  Both arguments are legally defective.

Garrett's punitive damages claims fail because it is well settled under New York law, which governs the Agreement, that "one may be indemnified for an illegal act which occurred prior to the making of the agreement." *Brauer v. Cent. Tr. Co.*, 77 A.D.2d 239, 245 (N.Y. App. Div. 1980). To the extent Garrett has been asked to reimburse Honeywell for punitive damages at all, those damages are properly subject to reimbursement because, as Garrett freely admits, they arise from alleged misconduct by one of Honeywell's corporate predecessors that ceased almost two decades before the Agreement came into force.  There is no moral hazard or public policy problem in permitting reimbursement of punitive damages associated with historical conduct that Garrett does not and cannot allege continues to the present.  And in all events, Garrett has not identified a single judgment awarding punitive damages that it has been asked to pay under the Agreement.  *See, e.g.*, *Gibbs-Alfano v. Burton*, 281 F.3d 12 (2d Cir. 2002).

With respect to Garrett's notice arguments, those also fail because the plain language of the Agreement grants Honeywell the right to settle Bendix asbestos claims in its sole discretion, without notice to or approval from Garrett.  *See* Agreement (Ex. A) § 2.9.  Garrett alleges no facts to support its claim that the settlements or associated defense costs are unreasonably high, and that claim is meritless where, as here, Honeywell retains a portion of the underlying liability.  *See, e.g.*, *Tokio Marine v. Macready*, 803 F. Supp. 2d 193, 203-04 (E.D.N.Y. 2011).

3

*Finally*, Garrett claims that Honeywell breached the Agreement by failing to provide information necessary for Garrett to "to satisfy its obligations as an SEC registrant," but that claim is moot.  Garrett declared a material weakness in early 2019 on the theory that Honeywell purportedly did not provide sufficient information about Garrett's Bendix-related obligations. Garrett then cleared the material weakness as of December 31, 2019 (before it filed this Complaint) on the basis of information it received from Honeywell months before this litigation even began in New York state court.  Ex. B (Garrett Motion Inc., SEC Form 10-K (2/27/2020)) at 108. Moreover, Garrett's requested relief—"fees and expenses" incurred in obtaining information from Honeywell—is contractually barred.  *See* Agreement § 4.11.  Garrett accordingly cannot maintain a claim for breach of the Agreement's information-sharing provisions.

For these reasons and those that follow, the Court should dismiss the Complaint.

## BACKGROUND

In 2017, Honeywell International Inc. ("Honeywell") announced that it would spin off its remaining automotive businesses into a separate company called Garrett Motion Inc. (together with plaintiff Garrett ASASCO Inc., "Garrett").  Compl. ¶¶ 47-48.  Su Ping Lu, Honeywell's Assistant General Counsel, served as president of Garrett while it was still a Honeywell subsidiary. *Id.* ¶ 21.  Guided by experienced legal and financial advisors, Ms. Lu took the steps necessary to separate Garrett from Honeywell.  As part of that process, Garrett received billions of dollars' worth of profit-generating automotive assets from Honeywell—including a turbocharger manufacturing business—and became an independent public company in the Fall of 2018.  *Id.* ¶¶ 57, 146.

In exchange for receiving Honeywell's automotive assets, Garrett agreed to reimburse Honeywell for certain asbestos-related expenses arising out of Honeywell's legacy automotive businesses.  In 1983, a Honeywell predecessor acquired the Bendix Corporation, a manufacturer

of automotive brakes that contained chrysotile asbestos. *Id.* ¶¶ 23, 27-29. Although it sold the Bendix business in 2014, Honeywell retained the Bendix-related asbestos liabilities and continues to be named in thousands of alleged asbestos-injury lawsuits each year. *Id.* ¶¶ 34, 39, 46. Before the spin-off was complete, Garrett and Honeywell entered into the Agreement, which provides that Garrett will pay 90% of Honeywell's liability and defense costs for Bendix-related personal injury claims for up to 30 years, less 90% of Honeywell's relevant insurance proceeds. Compl. ¶ 99 & Agreement art. II. The Agreement caps Garrett's payments at the Euro equivalent of $175 million per year, Agreement § 3.1, and the Bendix-related costs Garrett does not pay fall on Honeywell. Honeywell is responsible for the remaining 10% of all Bendix-related costs each year along with all such costs that exceed the $175 million cap in any given year.

The entire Garrett spin-off was expressly conditioned on Garrett assuming these payment obligations to Honeywell. The parties' Separation and Distribution Agreement ("Separation Agreement") specifically created a condition precedent to the distribution of Garrett shares that all "Ancillary Agreements"—including the Indemnification and Reimbursement Agreement—"shall have been executed by each party to such agreement." *See* Ex. C (Separation Agreement) §§ 1.01, 4.02(b). Simply put, unless Garrett agreed to reimburse Honeywell as set out in the Indemnification and Reimbursement Agreement, Garrett would have received no assets, the spin-off would not have occurred, and Garrett as it operates today would not exist.

Under the terms of the Agreement, Honeywell manages all Bendix litigation. Recognizing Honeywell's "experience with and efficient management of such matters," the Agreement provides that Honeywell will "be solely responsible for, and … have sole discretion with respect to, the Management of all Claims." Agreement at 2 & § 2.9. To ensure that Garrett can properly report its Bendix obligations on its own financial statements, the Agreement provides that

Honeywell will furnish Garrett with certain quarterly and annual reports regarding the Bendix docket as well as "additional information from time to time as may be necessary for [Garrett] to satisfy its obligations as an SEC registrant." *Id.* § 2.2(i). However, Honeywell "ha[s] no obligation to … consult, seek the consent of, cooperate with or otherwise inform" Garrett "regarding the investigation, defense, compromise, settlement or resolution of any Claim." *Id.* § 2.9.

The spin-off set Garrett up as a solvent, profitable company that was more than adequately capitalized. Before the spin-off was completed, outside advisors reviewed Garrett's financial health and confirmed that the company was solvent and would remain so—even if Garrett's Bendix obligations reached the full $175 million cap each year (which has never happened to date) and even in market downturns. Compl. ¶¶ 83-84, 112, 117. Garrett's own leadership explained to investors that the company is "well positioned" to "create long term value for shareholders" through its "strong position in its core turbo activities and a highly productive and flexible global operating platform," *see* Ex. D (Garrett Motion Inc., SEC Form 8-K (7/30/2019)) at 1, and that Garrett retained an "attractive financial profile" despite its reimbursement obligations to Honeywell, Ex. E (Garrett Motion Inc., SEC Form 8-K (9/07/2018)) at 62-63.[2] Those statements proved prescient: in 2019 alone, Garrett used the assets it received from Honeywell to generate over $3.2 billion in revenue, over $313 million in net profits, and $242 million in cash flow from operations, even after satisfying its "[o]bligations payable to Honeywell." *See* Ex. B (Garrett Motion Inc., SEC Form 10-K (2/27/2020)) at 7, 41-42, 65.

Shortly after the spin-off, however, Garrett began questioning those payment obligations and sought to evade them by challenging the validity of the Agreement and the broader spin-off.

---

[2] Courts "may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

Garrett ultimately made the required payments to Honeywell, but only "subject to a reservation of rights." Compl. ¶ 170. And Garrett began seeking information to which the Agreement did not entitle it, including information about Bendix claims resolved years before the spin-off. *See id.* ¶¶ 168-70. Honeywell, for its part, met with Garrett repeatedly and provided additional information beyond that required by the Agreement. *E.g.*, *id.* ¶¶ 171-73, 190. Despite these cooperative efforts, Garrett declared a material weakness in internal controls over financial reporting, claiming that Honeywell failed to provide Garrett with sufficient data to account for its Bendix-related liabilities. Ex. B at 33. Garrett later cleared that material weakness based on information that Honeywell provided in the Fall of 2019. *Id.*

Garrett nevertheless escalated these disputes to litigation early the next year. On January 15, 2020, Garrett filed a twelve-count Complaint in the New York Supreme Court for the County of New York, challenging both the Agreement as well as the broader spin-off, and naming as defendants Honeywell, certain of its affiliates, Mr. Adamczyk, and Ms. Lu (collectively, "Defendants"). *See Garrett Motion Inc. et al. v. Honeywell International Inc. et al.*, Index No. 657106/2019 (N.Y. Sup. Ct., N.Y. Cty.). Honeywell and the other Defendants moved to dismiss the Complaint on March 5, 2020. *See id.* at Doc. No. 32.

Garrett never filed an opposition to Honeywell's motion. Garrett's response was originally due on April 24, 2020, *id.* at Doc. No. 26, but Garrett chose not to respond on the merits and instead requested and obtained multiple extensions of time, *id.* at Doc. Nos. 41, 46, 51. As part of these requests, Garrett expressly represented that it would amend its January 15, 2020 complaint. *See id.* at Doc. No. 41 ("Defendants have agreed to withdraw their pending motion to dismiss . . . without prejudice, and the parties have negotiated a schedule for Plaintiffs to file an amended complaint."). The last of these extensions was entered on September 17, 2020 and would have

required Garrett to finally file its amended complaint by September 30, 2020.  *Id.* at Doc. No. 51.

The order was clear on its face that there would be "no additional adjournments without good

cause shown."  *Id.* at Doc. No. 51.

Three days later, Garrett commenced these bankruptcy proceedings.  It again failed to

amend its complaint and instead removed its original state court action to the Southern District of

New York, which automatically referred the action to this Court.  *See In re Garrett Motion, Inc.*,

Case No. 20-12212, Dkt. No. 68-8 (9/24/2020 Referral Order).  Since that referral, Garrett has

taken the position that its January 15, 2020 complaint is still operative and that, if it ever does

decide to file an amended complaint, it will not do so before December 2020 at the earliest.

In light of Garrett's election to proceed on the existing complaint, Honeywell now files this

motion to dismiss so that the Court can address the key legal deficiencies in Garrett's case.  As

Garrett has known for at least seven months, each of the claims presented by its January 15, 2020

Complaint fails as a matter of law.  Resolving these legal issues now will either resolve this

adversary proceeding in its entirety or, at the very least, streamline the parties' litigation efforts if

and when Garrett actually does file an amended complaint.

## **LEGAL STANDARD**

Bankruptcy Rule 7012(b) "makes Rule 12(b)(6) of the Federal Rules of Civil Procedure

applicable to adversary proceedings."  *In re Chowaiki & Co. Fine Art Ltd.*, 593 B.R. 699, 711

(Bankr. S.D.N.Y. 2018).  A complaint must "contain[] sufficient factual matter . . . to state a claim

to relief that is plausible on its face."  *Mandala v. NTT Data, Inc.*, --- F.3d ---, 2020 WL 5614818,

at *2 (2d Cir. Sept. 21, 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court

need not accept "legal conclusions . . . couched as factual allegations," and "allegations that are

merely consistent with liability" are not "enough to defeat a motion to dismiss."  *Id.*

## ARGUMENT

I.    **Garrett's Facial Attacks On The Indemnification And Reimbursement Agreement Fail As A Matter of Law.**

Garrett seeks to invalidate the Agreement in its entirety under a variety of legal theories, each resting on the same flawed assertion that the spin-off was somehow improper because it resulted in Garrett assuming reimbursement obligations for most of Honeywell's Bendix-related asbestos liabilities. Garrett now claims that the Agreement is the product of a breach of fiduciary duty (Counts 3 and 4), unconscionable (Counts 1 and 9), void for lack of consideration (Count 2), and subject to rescission because it amounts to "corporate waste" (Count 5). But the Agreement is valid and enforceable under Delaware and New York law, and Garrett may not unilaterally repudiate the Agreement and shed the payment obligations it assumed in the spin-off while retaining the valuable automotive assets it received in the same transaction.[3]

A.    **Plaintiffs' Fiduciary Duty Claims Fail Under Settled Delaware Precedent.**

Delaware law grants a parent company like Honeywell broad latitude to structure a spin-off as it sees fit. *See, e.g.*, *Anadarko*, 545 A.2d at 1174; *Aviall*, 110 F.3d at 896. This latitude is premised on the underlying principle that a parent company "does not owe fiduciary duties to its wholly-owned subsidiaries." *Trenwick Am. Litig. Tr. v. Ernst & Young, LLP*, 906 A.2d 168, 191 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007). Rather, "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." *Anadarko*, 545 A.2d at 1174. That settled rule holds true even when the parent intends to spin-off the subsidiary, and parent

---

[3] Although Garrett's contract claims are governed by New York law, *see* Agreement § 4.4, its fiduciary duty and waste claims are governed by Delaware law because Garrett was incorporated there, *see, e.g.*, *Asbestos Workers Phila. Pension Fund v. Bell*, 137 A.D.3d 680, 681 (N.Y. App. Div. 2016); *VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1115-16 (Del. 2005).

companies are plainly allowed to allocate to a SpinCo liabilities that the SpinCo may later wish it did not have. *See, e.g., Aviall*, 110 F.3d at 896 ("[Parent] was obligated to draft those terms [of the spin-off] in the manner most advantageous to its shareholders."); *Chemours*, 2020 WL 1527783, at *14 ("Wholly-owned subsidiary corporations are expected to operate for the benefit of their parent corporations; that is why they are created." (quoting *Trenwick*, 906 A.2d at 173)).

Indeed, the only limitation on how a parent can structure a spin-off is that the SpinCo must be adequately capitalized and able to satisfy its obligations as they come due, lest the spin-off later be deemed a fraudulent transfer. This proposition is discussed at length in *In re Tronox Corp.*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013), where the parent company saddled the SpinCo with excessive liabilities but provided insufficient assets to cover them. Apart from this solvency constraint, however, a parent may allocate assets and liabilities to the SpinCo in any way it sees fit to advance the interests of the parent's own shareholders. *See, e.g., Anadarko*, 545 A.2d at 1177; *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 2013 WL 12124306, at *3 (N.D. Tex. June 18, 2013).

Here, Honeywell satisfied its obligations under Delaware law by structuring the Garrett spin-off to maximize value for Honeywell's shareholders while ensuring that Garrett had sufficient assets to cover its liabilities. Garrett never alleges that it was insolvent at the time of the spin-off or that it faced the issues presented in *Tronox*. That missing allegation alone confirms that Garrett's fiduciary duty claims fail. And in all events, Garrett's own statements confirm the opposite: despite casting itself as a downtrodden "asbestos piggybank" in this litigation, Compl. ¶ 4, Garrett's CEO told investors around the time it commenced this litigation that it maintained "solid cash flow," is producing "strong customer win rates with a robust schedule of new product launches," and is "well positioned to build upon the progress we achieved during our first full year as an independent company." Ex. F (Garrett Motion Inc., SEC Form 8-K (2/27/2020)) at 2.

Dovetailing with those public statements, Garrett's SEC filings show that it generated over $3.2 billion in revenue and $313 million in net income in 2019 alone.  *See* Ex. B at 62.  Garrett's corresponding obligations to Honeywell under the Agreement amounted to only $153 million during the same period.  *Id.* at 95.  Garrett even continued to use its available cash flow to pay down long-term debt in advance of its required payments, a far cry from insolvency.  *Id.* at 85.

Moreover, solvency for the purposes of evaluating a *Tronox* problem is measured from the time of the spin-off—subsequent and unpredictable economic crises are not relevant, and a company "does not need resources sufficient to withstand any and all setbacks."  *In re Iridium Operating LLC*, 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007).  Yet Garrett nonetheless ably weathered the COVID-19 crisis.  By July 30, 2020, Garrett had "safely resumed operations with plants in China producing at pre-crisis levels," and reported "$482 million in available liquidity."  Ex. G (Garrett Motion Inc., Current Report (Form 8-K, 7/30/2020)) at 1, 3.  Even after commencing these Chapter 11 cases, Garrett acknowledged to the Court that it "had a strong cash position," that "it was not essential for Garrett motion to borrow money today," and that "this is a fundamentally healthy business from an operating level."  9/21/2020 Tr. at 39:22-40:1, 46:5-6.  At the time of Garrett's filing, Garrett reported that it had more than $280 million in cash on hand, later revised to $297 million.  *In re Garrett Motion, Inc.*, Case No. 20-12212, Dkt. No. 46 at ¶ 2; Dkt. No. 98 at 7.

Garrett's failure even to try to allege insolvency at the time of its spin-off from Honeywell undermines its fiduciary duty claims.  Indeed, Garrett expressly acknowledges that outside advisors at Duff & Phelps assessed the spin-off before it was completed and concluded that: "Garrett's assets exceed its debts"; "Garrett should be able to pay its debts as they come due"; and "Garrett will not have an unreasonably small amount of assets for its current and future

businesses." Compl. ¶ 84. Although Garrett insinuates that this solvency opinion was somehow "skewed," *id.* ¶ 85, Garrett does not allege that Duff & Phelps' conclusions were incorrect, or that Garrett was unable to meet its financial obligations. For this reason alone, Garrett's fiduciary duty claims fail as a matter of law. *See U.S. Bank*, 2013 WL 12124306, at *3 ("While the plaintiff has pointed to a number of titillating allegations concerning [the parent] and [the director]'s conduct in connection with the spin-off, none of these allegations can be said to have ***caused*** [the SpinCo] to be unable to meet legal obligations. … For this reason alone, the plaintiff cannot prevail on its breach of fiduciary duty claim.").

Unable to claim insolvency, Garrett attempts to manufacture a different fiduciary duty claim by alleging that Honeywell acted improperly and failed to provide Garrett with independent representation during the spin-off process. *E.g.*, Compl. ¶¶ 5, 61, 62, 86, 91. Yet neither *Anadarko* nor *Trenwick* allows a solvent SpinCo to challenge the process of its creation as a breach of fiduciary duty. And other courts, including the Southern District of New York and the Delaware state courts, have expressly concluded that there is "no obligation to provide the subsidiary with independent representation during the spin-off process," as Garrett claims was necessary here. *Aviall, Inc. v. Ryder Sys.*, 913 F. Supp. 826, 832 (S.D.N.Y. 1996), *aff'd*, 110 F.3d 892 (2d Cir. 1997); *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 1987 WL 16508, at *4 (Del. Ch. Sept. 8, 1987), *aff'd*, 545 A.2d 1171 (Del. 1988); *Chemours*, 2020 WL 1527783, at *14. There was thus nothing improper about Honeywell controlling Garrett's operations while it remained a wholly-owned subsidiary before the spin-off was complete. That is how parents and wholly-owned subsidiaries interact, and Garrett cannot cry foul over a purported lack of independent representation. Garrett's contention that, for example, Honeywell's CEO "unilaterally imposed" the terms of the spin-off on Garrett by improperly "install[ing] one of Honeywell's own in-house

lawyers … as Garrett's president and sole director," Compl. ¶ 5, is insufficient to state a claim.  A

parent company does not violate any fiduciary duty by declining to give a SpinCo its own lawyers

or representatives.  *See Aviall*, 913 F. Supp. at 832.

Garrett's fiduciary duty claim against Ms. Lu fails for reasons similar to those just

described.  Garrett alleges that Ms. Lu breached her duties to Garrett by signing the Agreement

because it was too favorable to Honeywell.  *See* Compl. ¶¶ 5, 295, 315.  But as the Third Circuit

has explained: "[I]t makes no sense to impose a duty on the director of a solvent, wholly-owned

subsidiary to be loyal to the subsidiary ***as against the parent company***."  *VFB LLC v. Campbell*

*Soup Co.*, 482 F.3d 624, 635 (3d Cir. 2007); *see also Trenwick*, 906 A.2d at 201 (rejecting duty of

loyalty and care claims because "Delaware law does not embrace the concept that a director of a

wholly-owned subsidiary owes a duty to second-guess the business judgment of its parent

corporation").[4]  Ms. Lu at all times acted in the best interest of Honeywell and its shareholders

and, as a matter of law, had no distinct or inconsistent duty to Garrett that she could have breached

by following Honeywell's direction.  The fiduciary duty claims against her should therefore be

dismissed.

Garrett's "aiding-and-abetting" claims against Mr. Adamczyk and the corporate defendants

are likewise deficient.  Under Delaware law, a claim for "aiding and abetting" requires a viable

claim for an underlying breach of fiduciary duty.  *In re Santa Fe Pac. Corp. S'holder Litig.*, 669

A.2d 59, 72 (Del. 1995).  Because Garrett cannot state a claim for breach for the reasons set forth

above, its aiding-and-abetting claims necessarily fail and should be dismissed.

---

[4] To the extent Garrett alleges breaches of the duty of care, those claims also fail because Garrett's charter waives
such claims as to directors like Ms. Lu.  *See* Ex. H (charter attached to Garrett Motion Inc. SEC Form S-8), art. IX;
*McMillan v. Intercargo Corp.*, 768 A.2d 492, 501 (Del. Ch. 2000).

**B. Garrett's Unconscionability Claims Do Not Provide A Separate Avenue For Relief.**

Garrett's claim that the Agreement is unconscionable is just a repackaging of its flawed fiduciary duty arguments. Garrett asserts that it "had no meaningful choice in the negotiation and execution of the Indemnification Agreement," that Honeywell "caused Garrett to be represented by the same counsel," and that "Honeywell used its control and authority over Garrett" to write the contract and force Garrett to accept it. Compl. ¶¶ 294-96. But these allegations do not state a claim for unconscionability; they simply describe an ordinary spin-off transaction that accords with settled precedent. As the Southern District of New York explained when disposing of a similar unconscionability claim:

> It is true that at the time of the spin-off Aviall's interests were represented by Ryder management, some of whom still work for Ryder, others of whom now work for Aviall. It is also true that Ryder's counsel … drafted the agreement, and that Ryder's current [CFO] signed the agreement on behalf of Aviall. … The spin-off procedure that Aviall decries as oppressive, however, is entirely consistent with traditional principles of corporate governance. When one company wholly owns another, the directors of the parent and the subsidiary are obligated to manage the affairs of the subsidiary in the best interests only of the parent and its shareholders.

*Aviall*, 913 F. Supp. at 832. And just this year, the Delaware Court of Chancery upheld an analogous parent-subsidiary agreement in the spin-off context on the same grounds. The court there rejected the same argument Garrett makes here, holding that a requirement of arm's length bargaining in a parent-subsidiary relationship is "***wholly inconsistent with the routine enforcement of parent-subsidiary contracts***." *Chemours*, 2020 WL 1527783, at \*14 (emphasis added); *see also Anadarko*, 545 A.2d at 1174. The court also went on to explain that "[s]uch contracts are routinely enforced ***not*** because they reflect arms'-length bargaining between a parent and its subsidiary—which of course they do not—but because the parent determines that they are desirable ***for the parent***, and subsidiary fiduciaries are obligated only to manage the affairs of the

14

subsidiary in the best interests of the parent and its shareholders." *Chemours*, 2020 WL 1527783, at *14. Any argument to the contrary, the court held, "fails as a matter of law." *Id.* This settled doctrine is the beginning and the end of Garrett's claim of unconscionability.

But even if unconscionability were an appropriate vehicle for challenging a spin-off (and it is not), there is no basis for Garrett to allege that this particular spin-off was actually unconscionable. Garrett cannot dispute that it received billions of dollars' worth of profit-generating assets in the spin-off and, in exchange, was required to reimburse Honeywell for a capped amount of certain Bendix liabilities. Garrett also cannot dispute that it turned a significant profit, even after satisfying those payment obligations. Ex. B at 62-65. The Agreement was far from a "one-sided" transaction, and it certainly does not justify the inequitable remedy of invalidating Garrett's payment obligations while allowing it to keep valuable assets. The two cannot be separated.

Perhaps recognizing that invalidating the entire Agreement is an impossibility, Garrett separately takes aim at narrow, specific portions of it, claiming that certain covenants in the Agreement "prohibit[] or restrict[]" it from engaging in "significant corporate transactions" and are therefore "unconscionable." Compl. ¶¶ 363-64. For all of the reasons set forth above, unconscionability is not a valid basis to challenge the terms of a spin-off. But more to the point, Garrett never identifies any covenant or restriction in the Agreement that actually bars it from "engag[ing] in significant corporate transactions." *Id.* ¶ 363; *see also Woods v. Boston Scientific Corp.*, 2007 WL 754093, at *3 (S.D.N.Y. Feb. 9, 2007) (upholding restrictive covenant under Delaware law and concluding that "business decisions are not an abdication of directorial authority merely because they limit a board's freedom of future action"). To the contrary, the Agreement expressly contemplates that Garrett can be bought or sold as part of potential "mergers and

15

acquisitions" that Garrett claims are somehow "prohibit[ed] or restrict[ed.]"  *Compare* Compl.

¶ 363 *with* Agreement § 4.7(b) (allowing Garrett to assign the agreement ***without Honeywell's***

***consent*** in a transaction that results in an investment-grade third party acquiring all or substantially

all of Garrett's assets).  Garrett offers nothing more than conclusory assertions that unspecified

covenants in the Agreement are unconscionable, which is insufficient to state a claim.

### C.  The Agreement Was Supported By Valid Consideration And Does Not Represent "Corporate Waste."

Plaintiffs' remaining theories—that the Agreement was "not supported by consideration"

from Honeywell, Compl. ¶ 310, and that Ms. Lu is somehow liable for "the waste of corporate

assets," *id.* ¶ 331—should also be dismissed for failure to state a claim.  To begin, Garrett does not

and cannot allege that the Agreement lacked consideration in light of the substantial assets Garrett

received in the spin-off.  Courts view steps in a related chain of transactions together as a "single

integrated transaction" so long as "the entire transaction is linked."  *See In re Old CarCo LLC*, 435

B.R. 169, 185-87 (Bankr. S.D.N.Y. 2010) (collapsing a 48-step restructuring plan for consideration

as a single transaction); *see also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995).

That is the case here, where Garrett concedes the Agreement was part of a larger planned

transaction that resulted in Garrett assuming an entire automotive business ***and*** related liabilities

within the defined SpinCo structure.  *See, e.g.*, Compl. at III.B & ¶ 67 ("The Separation Agreement

details the transfer of assets ***and*** assumption of liabilities that would occur in connection with the

spin-off.") (emphasis added).  Indeed, the Separation Agreement expressly required that Garrett

enter into the Indemnification and Reimbursement Agreement in order to receive Honeywell's

assets.  It specified that a "Condition Precedent to Consummation of the Distribution" was that

"Each Ancillary Agreement shall have been executed by each party to such agreement," Ex. C at

16

§ 4.02(b), and defined "Ancillary Agreements" to include "the Indemnification Agreement."  *Id.*
at § 1.01.  This coordinated exchange forecloses Garrett's claim for lack of consideration.[5]

Garrett's separate claim for corporate waste, brought only against Ms. Lu, similarly fails.
Corporate waste "entails an exchange of corporate assets for consideration so disproportionately
small as to lie beyond the range at which any reasonable person might be willing to trade."  *Brehm
v. Eisner*, 746 A.2d 244, 263 (Del. 2000).  Garrett again cannot allege anything like that here, as
Garrett received billions in automotive assets only because it agreed to assume reimbursement
obligations tied to the Bendix liabilities.  *E.g.*, Compl. ¶¶ 47-67; Ex. C at § 4.02(b).  The Garrett
spin-off would not have occurred at all but for Garrett's assumption of those obligations.

In all events, however, Ms. Lu could not, as a matter of law, "waste" Garrett's assets merely
by using them to confer a benefit on Honeywell, no matter how large.  Claims for corporate waste
are "classically derivative" and are ordinarily brought by an entity's shareholders.  *Turner v.
Bernstein*, 1999 WL 66532, at *11 (Del. Ch. Feb. 9, 1999).  Garrett's waste claim fails on its own
terms because it requires a showing that Ms. Lu gave away Garrett's assets (for no meaningful
value) at the expense of Honeywell, Garrett's sole shareholder at the time.  Yet the entire premise
of Garrett's waste claim is that Ms. Lu gave those assets away ***to Honeywell*** under the Agreement.
*E.g.*, Compl. ¶ 330.  Because Honeywell was both the beneficiary of the Agreement and the sole
shareholder of the Garrett entity purportedly giving away assets thereunder, Garrett's corporate
waste claim fails as a matter of law.  *See, e.g.*, *VFB LLC*, 482 F.3d at 635 ("Directors must act in

---

[5] Garrett's citation to N.Y. Gen. Oblig. Law § 5-1105 does not change this analysis.  *See* Compl. ¶ 308.  Section 5-1105 requires that "consideration for the promise [that] is past or executed" must be "expressed in … writing" in order to constitute valid consideration.  But, as *Old CarCo* makes clear, documents memorializing other steps in the same transaction—including, here, the Separation Agreement—are part of the consideration inquiry.  435 B.R. at 185.

the best interests of a corporation's shareholders, but a wholly-owned subsidiary has only one shareholder: the parent. There is only one substantive interest to be protected.").

## II. Honeywell Is Entitled To Full Payment Under The Indemnification And Reimbursement Agreement.

In addition to its facial challenge to the spin-off, Garrett also alleges that Honeywell is not entitled to full payment under the Agreement based on claims for unjust enrichment (Count 7); breach of contract, including breach of certain representations and warranties in the Agreement (Counts 8, 11, and 12); and a declaratory judgment that Honeywell has "no right to indemnification" (Count 6). Garrett's substantive arguments across all these counts are two-fold. *First*, Garrett claims the Agreement is "unenforceable to the extent it provides for indemnification of amounts attributable to claims for punitive damages and intentional misconduct." Compl. ¶¶ 341(a), 344, 351, 380. *Second*, Garrett asserts that, because Honeywell purportedly enters into settlements without notice to Garrett, Honeywell is not entitled to full payment unless it "establish[es] that Honeywell would have been liable" for the claims at issue. *Id.* ¶¶ 341(b), 344, 352. Both of these contentions are wrong, and the claims based upon them should be dismissed.

### A. The Indemnification And Reimbursement Agreement Accords With New York Law On Indemnification For Punitive Damages and Intentional Misconduct.

Garrett's first argument rests on the premise that the Agreement "illegally require[s] Garrett to indemnify Honeywell for punitive damages." *Id.* ¶ 3. That assertion is wrong as a matter of law. New York law does not bar parties from allocating responsibility for already completed acts, including those that arise from intentional misconduct or result in an award of punitive damages. *See Feuer v. Menkes Feuer, Inc.*, 8 A.D.2d 294, 297 (N.Y. App. Div. 1959). And even if Garrett could show that such agreements were unenforceable, its claims would still fail because it cannot identify any punitive damages judgments that it has been asked to pay in the first place.

**1.      New York Law Does Not Bar Indemnification Or Reimbursement For Punitive Damages Based On Prior Misconduct.**

Garrett misapprehends the law concerning indemnification of punitive damages. New York courts have long recognized that, because punitive damages are meant "as punishment and as a deterrent, the policy behind their imposition would be defeated" were an individual permitted to pass them on to a third party. *Hartford Acc. & Indemn. Co. v. Village of Hempstead*, 397 N.E.2d 737, 742-43 (N.Y. 1979). But the considerations are different where, as here, the conduct at issue is already long-past. In considering whether a party could receive indemnification for the consequences of a ***prior*** "crime or illegal act"—as opposed to conduct that may take place in the future—the New York Appellate Division put it this way:

> There may be no dispute that one may not contract for indemnification for the consequences of a criminal or illegal act to occur in the future. But the distinction has always been sharply made, with contrary effect, with respect to agreements to indemnify one *post factum* for the financial consequences of a crime or illegal act. In other words, one may make an agreement to be indemnified or to indemnify with respect to a crime or illegal act which occurred prior to the making of the agreement.

*Feuer*, 8 A.D.2d at 297-98. As *Feuer* explained, while "any agreement which might encourage or further the ***prospective*** commission of a crime or other illegal act should receive no assistance from the law … there may be many quite valid, and even desirable, purposes in allocating the ultimate financial responsibility among persons involved in a transaction." *Id.* at 298 (emphasis added). The Appellate Division thus upheld the indemnification agreement at issue, even though it allowed a party to receive coverage for consequences of a past crime.[6]

---

[6] New York is not alone on this well-settled question of law. *See, e.g.*, *Katun Corp. v. Clarke*, 484 F.3d 972, 977 (8th Cir. 2007); *Loscher v. Hudson*, 182 P.3d 25, 34 (Kan. Ct. App. 2008); *Oxy USA, Inc. v. S.W. Energy Prod. Co.*, 161 S.W.3d 277, 286-87 (Tex. App. 2005); *see also Williston on Contracts* § 19:18 (4th ed. 1990) ("A contract to indemnify against the consequences of an act that has already been committed has also been generally upheld.").

The same reasoning disposes of Garrett's claims here. As the Complaint acknowledges, Bendix stopped selling asbestos-containing brakes in 2001, seventeen years before the Garrett spin-off. Compl. ¶ 26. But liability for that conduct nevertheless continues to impact Honeywell given the extended latency period of asbestos-related diseases. *Id.* ¶ 36. The Agreement is thus enforceable even with respect to punitive damages because it does not insulate Honeywell from future misconduct but instead serves only to "allocat[e] the ultimate financial responsibility" for those long-past actions of a corporate predecessor. *Feuer*, 8 A.D.2d at 298; *Brauer*, 77 A.D.2d at 245 ("[O]ne may be indemnified for an illegal act which occurred prior to the making of the agreement."). In exchange for receiving assets from Honeywell's automotive businesses, and with the benefit of Honeywell's offsetting insurance coverage, Garrett was allocated responsibility for no more than 90% of Honeywell's annual Bendix-related liabilities. Garrett does not and cannot show that such an allocation violates New York public policy—even if it covers liabilities stemming from allegations of prior intentional misconduct—because the Agreement does not incentivize *any* future sales of asbestos-containing products.

Indeed, a federal court in Ohio recently relied on *Feuer* to reject the same argument Garrett makes here: that an agreement to indemnify a party for past asbestos liabilities—including punitive damages—is unenforceable. That agreement arose out of the sale of a transportation division which, much like the legacy Bendix business, made brake products that contained asbestos. *See Parker Hannifin Corp. v. Standard Motor Prods., Inc.*, 2019 WL 5425242, at *1 (N.D. Ohio Oct. 23, 2019). Recognizing the need to allocate responsibility for asbestos-related liabilities, the parties agreed the buyer would "indemnify, defend, and hold Seller harmless" for certain of those liabilities. *Id.* at *3. Years later, a jury awarded punitive damages against the seller, and the buyer

attempted to renege on its agreement. *Id.* at *19. Like Garrett, it claimed that applicable law "prohibit[ed] indemnification of monies paid to an award of punitive damages." *Id.*

Citing the New York Appellate Division's decision in *Feuer*, the court in *Parker Hannifin* rejected the buyer's argument and held that the contract was a valid allocation of responsibility for *all* past conduct, including conduct resulting in an award of punitive damages:

> Thus, the parties' Agreement was not a form of insurance against Parker Hannifin's future acts, but rather a negotiated solution for the financial consequences of actions that had already occurred. In other words, the Agreement does not allow Parker Hannifin to continue to engage in tortious conduct without fear of financial consequences in the form of punitive damages. Rather, the Agreement is limited solely to allocating responsibility for Parker Hannifin's past conduct. Accordingly, Ohio's public policy concern that indemnification of punitive damages would diminish the deterrent effect of punitive damages awards, is not implicated under the circumstances presented.

*Id.* at *21. The same result should obtain here. As in *Parker Hannifin*, the Agreement allocates responsibility for past conduct and does not "allow [Honeywell] to continue to engage in tortious conduct without fear of financial consequences." *Id.* Nor does the Agreement let Honeywell freely "offload the financial burdens" of that past conduct, Compl. at III.A & ¶ 47; rather, Honeywell has (like the seller in *Parker Hannifin*) paid substantial sums to resolve Bendix-related claims for many years, and has further paid Garrett billions of dollars in assets in exchange for a capped amount of future Bendix-related payments. *Id.* ¶ 146. Garrett's punitive damages arguments accordingly provide it no basis for asserting that the Agreement is unjust or invalid, and its claims relying on those arguments should be dismissed.

### 2. Any Limit On Indemnification Or Reimbursement Of Punitive Damages Does Not Apply To Settlements.

Even assuming for the sake of argument that punitive damages are not subject to indemnification or reimbursement under New York law, Garrett still does not state a valid claim because it has not and cannot identify any punitive damages award that it has been asked to pay.

As the Complaint makes clear, "Honeywell settles the vast majority of its Bendix-related asbestos claims," which "rarely go to trial."  Compl. ¶ 212.  Garrett identifies only six verdicts against Honeywell since 2004, as compared to thousands of claims Honeywell has successfully litigated, settled, or had dismissed.  *Id.* at ¶¶ 212-14.  Of those six cases, Garrett identifies punitive damages awards in only two of them.  *Id.* at ¶¶ 215-221.  But as Garrett concedes, the first case, *Phillips*, pre-dated the spin-off and Garrett's reimbursement obligations.  *Id.* at ¶ 216.  The other, *Thomas*, "reached a standard high-low settlement" before the verdict was released, *id.* at ¶ 221, and Garrett does not allege that Honeywell has sought reimbursement of any payment beyond the jury's compensatory award.  Perhaps recognizing that punitive damages *judgments* are so rare in Honeywell's Bendix cases as to be irrelevant, Garrett takes a broader approach and resorts to attacking Honeywell's *settlements*.

Garrett's arguments fly in the face of New York precedent.  In Garrett's view, "Honeywell's settlements contain a punitive component in every case in which a punitive damages claim is alleged," and Garrett "cannot be required to indemnify Honeywell for" these amounts.  *Id.* ¶¶ 206, 223.  But courts in New York hold that any limits on indemnification of punitive damages and claims for intentional misconduct do not apply when the parties settle a case without an admission of wrongdoing.  As the Second Circuit explained the state of the law: "Defendants have not cited any case, and we found none, where a New York court declined to enforce an otherwise valid indemnification agreement between parties where the party seeking indemnification settled, without admitting liability, claims against it alleging intentional wrongdoing."  *Gibbs-Alfano*, 281 F.3d at 21; *see also In re Residential Capital, LLC,* 524 B.R. 563, 596 (Bankr. S.D.N.Y. 2015) ("Here, as in *Gibbs-Alfano*, [the defendant] settled the claims for which it seeks indemnification without admitting liability. … Plaintiff's indemnity claims may proceed under New York law.").

Garrett thus cannot escape its obligations merely on the theory that, if cases did actually go to trial, a punitive damages award might result.  As *Gibbs-Alfano* made clear: "[I]n the absence of a ***judgment*** of intentional conduct on the part of the [] Defendants, we do not find any reason under New York public policy to hold the Indemnification Clause unenforceable" in connection with a settlement payment.  281 F.3d at 21 (emphasis added).  In light of these decisions, Garrett's theory of an unindemnifiable punitive premium in every settlement fails as a matter of law.

## B.    Garrett Cannot Attack The "Reasonableness" Of Honeywell's Settlements.

Garrett separately claims that "Honeywell is also not entitled to indemnification because it has failed to establish other prerequisites for indemnification."  Compl. ¶ 267.  In Garrett's view, because Honeywell has not provided Garrett advance notice of the settlements, Honeywell is entitled to indemnification only if Honeywell "would have been actually liable for each and every one of the underlying claims" and if each settlement "was entered into in good faith and was reasonable."  *Id.* at ¶ 271. These arguments fail under the plain terms of the Agreement and are wrong as a matter of law.

Honeywell has discretion under the Agreement to settle and manage Bendix claims without informing, consulting, or seeking consent from Garrett.  *See* Agreement § 2.9.  New York courts construe indemnity agreements, like other contracts, according to their written terms.  *See Campisi v. Gambar Food Corp.*, 130 A.D.3d 854, 855 (N.Y. App. Div. 2015).  In this case, Section 2.9 identifies Honeywell as the "Claim Manager" and provides that:

> The Claim Manager shall be solely responsible for, ***and shall have sole discretion with respect to, the Management of all Claims***. Payor shall have the right to meet with the Claim Manager's outside litigation or environmental counsel once each Fiscal Quarter to discuss the US Bendix Reports … ***the Claim Manager shall have no obligation to*** implement or adopt Payor's requests during such meeting or otherwise ***consult, seek the consent of, cooperate with or otherwise inform … Payor or any of its Affiliates or their respective Representatives regarding the***

> ***investigation, defense, compromise, settlement or resolution of any Claim***,
> regardless of the party against whom any such Claim may be asserted.

Agreement § 2.9 (emphases added).

Notwithstanding this unambiguous contract language, Garrett attempts to rely on what it perceives as favorable background rules that govern indemnification relationships under New York law. Under those background rules, although "an indemnitee is not required to give notice of claims against him to the indemnitor," an indemnitee seeking reimbursement for a settlement assumes additional burdens if advance notice of the settlement is not provided to the indemnitor, including the burdens of "establish[ing] that he would have been liable," and that "the amount paid … was a reasonable amount." *Feuer*, 8 A.D.2d at 298-99. Yet these background rules are no help to Garrett here because it is well settled that they may be modified or eliminated by contract. Courts have expressly declined to apply Garrett's proposed background rules where, as here, an indemnification agreement "not only contained no such provision for notice, but in fact contained a waiver of such notice requirement to the indemnitor." *Republic Ins. Co. v. Real Dev. Co.*, 161 A.D.2d 189, 190 (N.Y. App. Div. 1990); *see also Star Ins. Co. v. A&J Constr. of N.Y., Inc.*, 2017 WL 6568061, at *5 (S.D.N.Y. Dec. 22, 2017).

These decisions dispose of Garrett's "notice" or "prerequisites to indemnification" arguments. Honeywell is obligated only to provide quarterly and annual reports required by the Agreement (which Garrett concedes Honeywell has provided, Compl. ¶¶ 101, 124-125), not notice of individual claims. Agreement §§ 2.2, 2.9. As the Complaint admits, Garrett thus has "no right to participate in the settlements or … receive notice of them," Compl. ¶ 142, and its contentions that Honeywell has not "established [its] right to indemnification" or "establish[ed] other prerequisites for indemnification" are wrong under the plain terms of the parties' Agreement.

*Compare* Compl. ¶¶ 340, 344, 352 (Counts 6, 7, 8) *with Star Ins.*, 2017 WL 6568061, at *7 ("The GAI gives Plaintiff the right to settle claims in its sole discretion without notice to Defendants.").

Garrett's claim that Honeywell must prove that "each settlement for which [it] seeks indemnification was reasonable and entered into in good faith," Compl. ¶ 199, is wrong for similar reasons. Courts in New York routinely uphold agreements that allow an indemnitee to settle claims in its "sole discretion," *Star Ins.*, 2017 WL 6568061, at *7, or if it is "under the belief that it is or was liable for the sums" at issue, "or that it was necessary or expedient to make such disbursements, whether or not such liability … existed," *Int'l Fid. Ins. Co. v. Spadafina*, 192 A.D.2d 637, 638-39 (N.Y. App. Div. 1993). The Agreement gives Honeywell a similar right to settle claims as it sees fit. *See* Agreement § 2.9. And even if it did not, Garrett's "good faith" arguments still rest on rank speculation. Garrett pleads no facts demonstrating that any of Honeywell's Bendix settlements or defense expenditures are made in bad faith. Moreover, under the Agreement, Honeywell still retains risk: it pays 10% of all claims and defense expenses and any annual costs over $175 million. Compl. ¶¶ 74, 103. That is again enough to overcome Garrett's claims because "[c]ourts can presume an indemnitee's good faith where the indemnitee's self-interest would require it to seek a favorable settlement, such as where an indemnitee faces potential liability for some or all of [third party] plaintiffs' damages." *Tokio Marine*, 803 F. Supp. 2d at 203-04.

### III.    Garrett's Information-Sharing Claim Fails.

Finally, Garrett's breach-of-contract claim (Count 10) is moot and fails under the plain text of the Agreement. Garrett alleges that Honeywell forced it to report a "material weakness" by not turning over certain information about the Bendix claims that Honeywell is purportedly required to provide. Garrett seeks unspecified "fees and expenses" incurred in obtaining that information.

Compl. ¶¶ 327-75.  Garrett now admits, however, that the material weakness was "remediated"
thanks to "additional information and documentation received from Honeywell" *before* Garrett's
complaint was filed.  Ex. F at 4.  Indeed, Garrett concedes this remediation was accomplished "as
of December 31, 2019," *id.*, on the basis of information Honeywell provided in the Fall of 2019.
Compl. ¶¶ 190, 197.  This timeline renders Garrett's claims moot.

Garrett's requested damages—"fees and expenses"—are, moreover, governed by Section
4.11 of the Agreement, which provides that "all costs and expenses incurred in connection with
this Agreement and the transactions contemplated hereby shall be paid *by the Party incurring
such costs and expenses*," and that fees are available only if "an action at law or equity is
*necessary* to enforce or interpret" the Agreement.  Garrett cannot allege that litigation was
"necessary" for it to obtain information needed to satisfy its SEC obligations because Garrett
received that information from Honeywell months before commencing this lawsuit. Garrett's
claim is accordingly barred by the Agreement and should be dismissed.[7]

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

---

[7] Count 12, a claim for breach of the implied covenant of good faith, in part relies on Garrett's theory that the
Agreement covers "non-indemnifiable amounts."  Compl. ¶ 391.  It fails for the same reasons discussed in Part II.
The remainder of Count 12 only reiterates Garrett's flawed information-sharing claim and may be dismissed for the
same reasons discussed in this Part III, and also because it is duplicative of the breach-of-contract claim.  *See Fleisher
v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 299 (S.D.N.Y. 2012) (granting motion to dismiss because "New York
law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing
when a breach of contract claim, based on the same facts, is also pled."); *Amcan Holdings, Inc. v. Can. Imperial Bank
of Commerce*, 70 A.D.3d 423, 425-27 (N.Y. App. Div. 2010) ("The claim that defendants breached the implied
covenant of good faith and fair dealing was properly dismissed as duplicative of the breach-of-contract claim, as both
claims arise from the same facts.").

Dated:  New York, New York
       October 13, 2020

/s/ *Craig S. Primis*
Craig S. Primis, P.C.
Ronald K. Anguas, Jr. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200

- and -

Nicole L. Greenblatt, P.C.
Anthony R. Grossi
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Mark McKane, P.C. (admitted *pro hac vice*)
Michael P. Esser (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
555 California St.
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

*Counsel to Defendants*

27